**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>ENVIRONMENTAL PROTECTION AGENCY, et al.,<br><br>*Defendants*. | Civil Action No. 24-445 (JEB) |
| INHANCE TECHNOLOGIES LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>LEE ZELDIN, in his official capacity as ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>*Defendant*. | Civil Action No. 25-980 (JEB) |

**INHANCE'S REPLY IN SUPPORT OF**
**CROSS-MOTION FOR SUMMARY JUDGMENT IN FOIA CASE**

Susan M. Cook (D.C. Bar No. 462978)
Adam M. Kushner (D.C. Bar No. 426344)
Marlan Golden (D.C. Bar No. 1673073)
Claire A. Rhodes (D.C. Bar No. 90016150)
Carly M. Heying (D.C. Bar No. 90029062)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
susan.cook@hoganlovells.com

J. Tom Boer (D.C. Bar. No. 469585)
HOGAN LOVELLS US LLP
4 Embarcadero Center, Suite 3500
San Francisco, CA 94111
Telephone: (415) 374-2336
Facsimile: (415) 374-2499
tom.boer@hoganlovells.com

*Attorneys for Inhance Technologies LLC*

Dated: June 18, 2026

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

ARGUMENT ........ 2

I. INHANCE'S INFORMATION WARRANTS CONFIDENTIAL TREATMENT UNDER FOIA AND TSCA ........ 2

A. PEER and CEH's Request For Non-Disclosed Documents Is Too General ........ 2

B. Inhance's Information Is Commercial And Confidential ........ 2

*1. Inhance's Information Is Commercial* ........ 3

*2. Inhance's Information Is Confidential* ........ 7

C. Inhance Will Suffer Competitive Harm ........ 10

D. The Disputed Information Is Not A Health And Safety Study ........ 15

E. The Non-Disclosed Information Is Not Generalized ........ 23

II. THERE IS NO BASIS FOR ADDRESSING DOCUMENTS NOT INCLUDED IN EPA'S FINAL CONFIDENTIALITY DETERMINATION ........ 24

CONCLUSION ........ 25

## TABLE OF AUTHORITIES

Page(s)

**CASES:**

*100Reporters LLC v. DOJ*,
248 F. Supp. 3d 115 (D.D.C. 2017) ....................4, 5

*Baker & Hostetler LLP v. United States Dep't of Com.*,
473 F.3d 312 (D.C. Cir. 2006)....................3, 4

*Besson v. United States Dep't of Com.*,
480 F. Supp. 3d 105 (D.D.C. 2020) ....................5

*Camp v. Pitts*,
411 U.S. 138 (1973)....................24, 25

*Campaign Legal Ctr. v. FEC*,
520 F. Supp. 3d 38 (D.D.C. 2021) ....................2

*Citizens for Resp. & Ethics in Washington v. DOJ*,
728 F. Supp. 3d 113 (D.D.C. 2024) ....................3, 6

*Cornucopia Inst. v. Agricultural Mktg. Serv.*,
312 F. Supp. 3d 85 (D.D.C. 2018) ....................2

*Critical Mass Energy Project v. Nuclear Regul. Comm'n*,
975 F.2d 871 (D.C. Cir. 1992)....................5

*Electronic Priv. Info. Ctr. v. United States Dep't of Homeland Sec.*,
117 F. Supp. 3d 46 (D.D.C. 2015) ....................3

**Environmental Def. Fund v. EPA* ,
124 F.4th 1 (D.C. Cir. 2024) ....................8, 15, 16, 17, 18, 20, 22

*Flyers Rts. Educ. Fund, Inc. v. FAA*,
No. 19-cv-3749, 2021 WL 4206594 (D.D.C. Sep. 16, 2021) ....................7, 9

*Food Mktg. Inst. v. Argus Leader Media*,
588 U.S. 427 (2019)....................7, 10

*Greenberg v. FDA*,
803 F.2d 1213 (D.C. Cir. 1986)....................6

*In re Sealed Case*,
121 F.3d 729 (D.C. Cir. 1997)....................7

* Authorities upon which we chiefly rely are marked with an asterisk.

**TABLE OF AUTHORITIES–Continued**

Page(s)

*Inhance Techs. LLC v. EPA*,
96 F.4th 888 (5th Cir. 2024)....................21

*Kahn v. Federal Motor Carrier Safety Admin.*,
648 F. Supp. 2d 31 (D.D.C. 2009)....................3

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)....................17

*National Ass'n of Home Builders v. Norton*,
309 F.3d 26 (D.C. Cir. 2002)....................3

**Naumes v. Department of the Army*,
588 F. Supp. 3d 23 (D.D.C. 2022)....................8

*New York Times Co. v. FDA*,
529 F. Supp. 3d 260 (S.D.N.Y. 2021)....................9

*Occidental Petroleum Corp. v. SEC*,
873 F.2d 325 (D.C. Cir. 1989)....................6

*Occupational Safety & Health L. Project, PLLC v. United States Department of Lab.*,
No. 1:21-cv-2028, 2022 WL 3444935 (D.D.C. Aug. 17, 2022)....................3, 4

*Pinson v. DOJ*,
70 F. Supp. 3d 199 (D.D.C. 2014)....................24

**Public Citizen v. HHS*,
66 F. Supp. 3d 196 (D.D.C. 2014)....................4, 5, 6

*Public Citizen Health Rsch. Grp. v. FDA*,
704 F.2d 1280 (D.C. Cir. 1983)....................3, 4

*Renewable Fuels Ass'n v. EPA*,
519 F. Supp. 3d 1 (D.D.C. 2021)....................6, 8

*Sykes v. Dudas*,
573 F. Supp. 2d 191 (D.D.C. 2008)....................24

*Tokar v. DOJ*,
304 F. Supp. 3d 81 (D.D.C. 2018)....................4

*WP Co. v. National Highway Traffic Safety Admin.*,
No. 24-cv-1353, 2026 WL 820742 (D.D.C. Mar. 25, 2026)....................8

**TABLE OF AUTHORITIES–Continued**

Page(s)

*Youkelsone v. FDIC*,
910 F. Supp. 2d 213 (D.D.C. 2012) ....................2

**STATUTES:**

*15 U.S.C. § 2602(8)....................15, 17, 19, 20, 23

*15 U.S.C. § 2613
(a) ....................8
(b)(1) ....................22
(b)(2) ....................19, 22, 23
(b)(2)(A)....................19
(b)(2)(A)–(B) ....................19
(b)(2)(B)....................19
(b)(3) ....................23
(c)(1)(B)(iii) ....................10
(e)(1)(B) ....................8
(g)(1)(D)....................8

5 U.S.C. § 552(b)(4) ....................3

**REGULATIONS:**

40 C.F.R. § 703.3 ....................16, 17

40 C.F.R. § 716.20(a)(9) ....................17

40 C.F.R. § 716.3 ....................16

40 C.F.R. § 716.50(a)–(b) ....................17

*Confidential Business Information Claims Under the Toxic Substances Control Act (TSCA)*, 87 Fed. Reg. 29078 (May 12, 2022)....................20, 21, 22

*Health and Safety Data Reporting; Submission of Lists and Copies of Health and Safety Studies*, 47 Fed. Reg. 38780 (Sep. 2, 1982) ....................18

*Statutory Requirements for Substantiation of Confidential Business Information (CBI) Claims Under the Toxic Substances Control Act (TSCA)*, 84 Fed. Reg. 33939 (July 16, 2019) ....................9

**OTHER AUTHORITIES:**

EPA, *Frequent Questions about TSCA CBI* (captured Jan. 27, 2022),
https://tinyurl.com/2x8j832k....................9

**TABLE OF AUTHORITIES–Continued**

Page(s)

EPA, *Risk Assessment of the Per- and Polyfluoroalkyl Substances (PFAS) in SN-23-0002-0006 and SN-23-0008-0011* (Jan. 6, 2026), https://tinyurl.com/ycsb8pax....................21

EPA, *What to Include in CBI Substantiations* (captured Jan. 27, 2022), https://tinyurl.com/2wu88wss....................9

*Underlying*, Cambridge Dictionary Online, https://tinyurl.com/2z473msb ....................20

## INTRODUCTION

This FOIA case asks the Court to order the release of some of the most closely held, sensitive information that cuts to the core of Inhance's business operations. With the expectation that its information would remain confidential, Inhance turned over to EPA highly confidential information concerning its customers, proprietary fluorination process, and data from its research-and-development program aimed at reducing the levels of PFAS that can be unintentionally generated by the company's fluorination process.

In February 2025, EPA decided that some, but not all, of Inhance's confidential information could be disclosed. In this FOIA case, Public Employees for Environmental Responsibility (PEER) and Center for Environmental Health (CEH) seek an order directing EPA to publicize *all* of Inhance's information contained in the agency's decision. That request is at sharp odds with both Exemption 4 of FOIA and the confidentiality guarantees of the Toxic Substances Control Act (TSCA), and if granted, would cause Inhance substantial competitive harm. Inhance is also separately challenging portions of EPA's February 2025 decision to disclose some of Inhance's confidential information as unlawful under the Administrative Procedure Act (APA).

PEER and CEH's response barely acknowledges the extensive nature of the disclosure they seek. They focus instead on stretching the relevant legal standards under FOIA and TSCA. Although FOIA and TSCA authorize public access to certain information, Congress built into both statutes a set of protections for submitters of confidential information. This Court should deny PEER and CEH's motion for summary judgment and grant Inhance's cross-motion.

# ARGUMENT

## I. INHANCE'S INFORMATION WARRANTS CONFIDENTIAL TREATMENT UNDER FOIA AND TSCA.

### A. PEER and CEH's Request For Non-Disclosed Documents Is Too General.

Inhance has explained that PEER and CEH's motion should be denied because they broadly request the release of *all* withheld "redacted information" without specifying why each category of document (*e.g.*, proprietary process documents, confidential standard operating procedures, and closely guarded customer information) should be disclosed. Inhance APA/FOIA Br. 23–24, Dkt. Nos. 70-1, 71, 72; *see also Cornucopia Inst. v. Agricultural Mktg. Serv.*, 312 F. Supp. 3d 85, 94 (D.D.C. 2018) (explaining disclosure is not warranted when plaintiff "nowhere . . . rebut[ted] the Government's claim" that the information was confidential commercial information). In their opposition, PEER and CEH do not respond to this argument, instead largely repackaging the excessively general request they made to the agency: That all "the withheld testing documents" should be produced. PEER APA/FOIA Br. 5, Dkt. Nos. 73, 74, 75. PEER and CEH therefore concede that their request is too general. "[W]here a party fails to respond to arguments in opposition papers, the Court may treat those specific arguments as conceded." *Campaign Legal Ctr. v. FEC*, 520 F. Supp. 3d 38, 50 (D.D.C. 2021) (quotation omitted); *see also Youkelsone v. FDIC*, 910 F. Supp. 2d 213, 224 (D.D.C. 2012), *aff'd*, 560 F. App'x 4 (D.C. Cir. 2014) (similar). On this point alone, the Court should deny PEER and CEH's motion for summary judgment.

In addition, PEER and CEH's arguments fail on the merits, for the following reasons:

### B. Inhance's Information Is Commercial And Confidential.

As Inhance has explained, its information readily satisfies the criteria in FOIA Exemption 4. Inhance Br. 17–18, Dkt. No. 29-1; Inhance APA/FOIA Br. 21–22. The information in dispute

is both commercial and confidential under FOIA's governing standard. 5 U.S.C. § 552(b)(4). None of PEER and CEH's contrary arguments succeed.

*1. Inhance's Information Is Commercial.*

PEER and CEH first argue that information about Inhance's proprietary research-and-development program aimed at reducing PFAS levels in fluorinated containers does "not serve a commercial function or pertain to the exchange of goods or services or the making of a profit." PEER APA/FOIA Br. 5. This argument hinges on a cramped understanding of what constitutes commercial information under FOIA. FOIA does not define "commercial," so courts apply its ordinary meaning. Information is considered commercial when "it serves a 'commercial function' or is of a 'commercial nature,' " *National Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002), or when the submitter "has a commercial interest in the information," *Baker & Hostetler LLP v. United States Dep't of Com.*, 473 F.3d 312, 319 (D.C. Cir. 2006). This is a capacious standard: The "question of whether information is 'commercial' boils down to a common sense inquiry into whether the proponent has a business interest in that information." *Kahn v. Federal Motor Carrier Safety Admin.*, 648 F. Supp. 2d 31, 36 (D.D.C. 2009) (citing *Public Citizen Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983)).

Information qualifying as "commercial" includes information revealing basic business operations, customer lists, or research data. *Citizens for Resp. & Ethics in Washington v. DOJ*, 728 F. Supp. 3d 113, 121 (D.D.C. 2024); *see Electronic Priv. Info. Ctr. v. United States Dep't of Homeland Sec.*, 117 F. Supp. 3d 46, 62 (D.D.C. 2015). But that is not an exclusive list: Exemption 4 "covers more than just 'records that 'reveal basic commercial operations . . . or relate to the income-producing aspects of a business.' " *Occupational Safety & Health L. Project, PLLC v. United States Department of Lab.*, No. 1:21-cv-2028, 2022 WL 3444935, at *4 (D.D.C. Aug. 17,

2022) (quoting *Baker & Hostetler LLP*, 473 F.3d at 319). Information may also be commercial when, for example, it reveals "the way [ ] companies implement their compliance programs." *Tokar v. DOJ*, 304 F. Supp. 3d 81, 94 n.3 (D.D.C. 2018) (explaining that this kind of information "is sufficiently 'instrumental' to the companies' operations to qualify as 'commercial' " (quoting *Public Citizen v. HHS*, 66 F. Supp. 3d 196, 208 (D.D.C. 2014)). And information has likewise been considered "commercial" under FOIA Exemption 4 when it reflected a private company's commercial interest in the methods contained within an abatement plan and "measures to limit" undesirable substances. *Occupational Safety & Health L. Project*, 2022 WL 3444935, at *1, *5.

Inhance's disputed information squarely meets that standard. It concerns research-and-development testing aimed at reducing the amount of PFAS unintentionally formed in the physical-chemical structure of a container during Inhance's fluorination process. Inhance performed the testing and generated the data for use in developing and improving its proprietary PFAS-reduction processes. Inhance Br. 17–18; Inhance APA/FOIA Br. 22; Iyer Decl. ¶¶ 11–13, Dkt. Nos. 70-2, 71-1. Contrary to PEER and CEH's argument (at 7), the challenged information is commercial because it serves a commercial function—reducing the presence of an impurity in customers' treated containers—and is instrumental to Inhance's business operations. *See 100Reporters LLC v. DOJ*, 248 F. Supp. 3d 115, 134, 137 (D.D.C. 2017); *see also Public Citizen Health Rsch. Grp.*, 704 F.2d at 1290 (observing a submitter can have a commercial interest in "profit-oriented research").

EPA's treatment of the relevant information reinforces this conclusion, as explained below.

**Process Information.** Inhance's process and testing documents detail information about its fluorination process, modifications the company made to that process to reduce PFAS based on data from its research-and-development program, and Inhance's proprietary technical methods and

operations for controlling fluorination and minimizing PFAS formation. Iyer Decl. ¶¶ 28–31. Inhance has a commercial interest in this information, as it includes descriptions of its fluorination technology and its commercial application of this technology, as well as its proprietary technical methods to modify its process. *See Besson v. United States Dep't of Com.*, 480 F. Supp. 3d 105, 113–114 (D.D.C. 2020) (holding information describing a company's technology, commercial application of this technology, and "work to be performed" was commercial). If a competitor had knowledge of this information, it could gain an understanding of how Inhance has designed its fluorination process to reduce the unintentional formation of PFAS to develop or improve competing fluorination processes. That fact is more than sufficient to render the information commercial. *See id.* at 114.

**SOP Information.** The same is true of Inhance's standard operating procedure (SOP) information. This information describes Inhance's internal sampling protocols, quality-assurance and quality-control cross-contamination prevention steps, and safety procedures, as well as the proprietary isotope dilution chip testing method that Inhance developed in its efforts to improve the fluorination process. Iyer Decl. ¶¶ 32–35. That, too, is commercial in nature. Inhance "has a clear commercial interest in its basic business operations and techniques." *Public Citizen*, 66 F. Supp. 3d at 207–208 (quotation omitted); *see also, e.g.*, *Critical Mass Energy Project v. Nuclear Regul. Comm'n*, 975 F.2d 871, 875, 880 (D.C. Cir. 1992) (affirming that safety reports concerning construction and operation of nuclear facilities were commercial under Exemption 4); *100Reporters LLC*, 248 F. Supp. 3d at 134, 136.

**Customer Information.** Inhance's customer information also constitutes commercial information. It includes spreadsheets identifying Inhance's customer portfolio, its customers' product lines that utilize Inhance's fluorination services, the customer products Inhance employed

in its research-and-development program, and the container sizes and volumes that Inhance fluorinates. Iyer Decl. ¶¶ 36–37. Information about customer lists, customers' product lines, and product inventory is paradigmatic commercial information. *See Citizens for Resp. & Ethics in Washington*, 728 F. Supp. 3d at 121 (observing commercial information includes "records that actually reveal . . . customer lists" (quotation omitted)); *Greenberg v. FDA*, 803 F.2d 1213, 1216 (D.C. Cir. 1986) (inventories and customer lists may constitute commercial confidential information); *Public Citizen*, 66 F. Supp. 3d at 208 (log summaries were commercial where, in part, "they identif[ied] and describe[d] interactions with prescribers, consumers, and other customers of [the submitter's] various healthcare products"). If disclosed, Inhance's highly sensitive information could be used by a competitor to "identify and exploit [Inhance's] competitive weaknesses." *Renewable Fuels Ass'n v. EPA*, 519 F. Supp. 3d 1, 8–9 (D.D.C. 2021); *see also* Iyer Decl. ¶ 37.

PEER and CEH's motive-based arguments also hold no water. They speculate (at 7) about Inhance's "real reason" for exercising its right to object to disclosure of its information but cite no authority suggesting that a submitter's subjective motivation bears on whether information is commercial. *Cf. Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 341 (D.C. Cir. 1989) (explaining submitter's "right to an exemption" does not depend on submitter's "motive" for "seeking confidential treatment"). In any event, there is no validity to the suggestion that an ulterior motive underlies Inhance's positions in this case. Inhance indisputably has a commercial interest in maintaining confidentiality over its most sensitive information. By reducing the unintentional formation of PFAS in its fluorination process for customers' containers, Inhance sought to develop an improved commercial offering, retain its existing customers, attract new customers, increase profits, and gain a competitive advantage, as customers prefer a process with

reduced PFAS formation. *See* Inhance APA/FOIA Br. 22; Iyer Decl. ¶¶ 11–12, 37. PEER and CEH's additional arguments about any purported public interest in the information (at 6) have no bearing on whether the information falls within Exemption 4. *See Flyers Rts. Educ. Fund, Inc. v. FAA*, No. 19-cv-3749, 2021 WL 4206594, at *9 (D.D.C. Sep. 16, 2021) ("[T]he 'importance' or 'necessity' of the withheld materials to any such external scrutiny has no bearing on whether such material must be disclosed under FOIA."), *aff'd*, 71 F.4th 1051 (D.C. Cir. 2023); *In re Sealed Case*, 121 F.3d 729, 738 n.5 (D.C. Cir. 1997) ("[T]he particular purpose for which a FOIA plaintiff seeks information is not relevant in determining whether FOIA requires disclosure.").

*2. Inhance's Information Is Confidential.*

Inhance's information also is "confidential" under Exemption 4, as it is "both customarily and actually treated as private." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 440 (2019). When Congress enacted FOIA sixty years ago, " 'confidential' meant then, as it does now, 'private' or 'secret.' " *Id.* at 434. PEER and CEH's argument that Inhance's information is not confidential because "[t]here must be an assurance of privacy by the government" is wrong on both the law and the facts. PEER APA/FOIA Br. 7.

First, the law. The Supreme Court in *Argus Leader Media* expressly did not decide whether a government assurance of privacy is a condition precedent to protection from disclosure under Exemption 4. 588 U.S. at 434–435 (observing "there's no need to resolve" whether "information [can] *lose* its confidential character for purposes of Exemption 4 if it's communicated to the government without assurances that the government will keep it private"). But contrary to PEER and CEH's contention, "[t]his Circuit does not require assurances of privacy as a separate component of confidentiality" under FOIA. *Naumes v. Department of the Army*, 588 F. Supp. 3d 23, 40 (D.D.C. 2022) (Boasberg, J.) (declining to "read the word 'confidential' " as "impos[ing] a

blanket requirement that the government provide an assurance of privacy in every case in which it asserts Exemption 4"); *see also, e.g.*, *Renewable Fuels Ass'n*, 519 F. Supp. 3d at 12.

What's more, and contrary to PEER and CEH's argument (at 7–8), Inhance *did* in fact submit its information to EPA under an assurance of privacy. EPA's governing confidentiality statute supplies that assurance. 15 U.S.C. §§ 2613(a), (e)(1)(B), (g)(1)(D). First, TSCA "requires EPA to protect from disclosure information" submitted to EPA if the information is covered by Exemption 4 and meets certain TSCA requirements. *Id.* § 2613(a); *see also Environmental Def. Fund v. EPA*, 124 F.4th 1, 7 (D.C. Cir. 2024) (*EDF*). Inhance asserted and substantiated confidentiality claims over information it submitted to EPA that satisfied those requirements. *See* Inhance Br. 8–9, 17–18.

Second, once Inhance asserted confidentiality claims over its information, TSCA mandates confidential treatment of that information unless and until EPA determines otherwise. 15 U.S.C. § 2613(g)(1)(D) (EPA's failure "to make a decision regarding a claim or request for protection from disclosure . . . shall not have the effect of denying or eliminating [the] claim or request for protection from disclosure."). And third, TSCA protects Inhance's information from disclosure for 10 years unless the claims are withdrawn or EPA decides the information does "not qualify for protection from disclosure." 15 U.S.C. § 2613(e)(1)(B). TSCA itself therefore provides ample assurances that Inhance's information remains private unless EPA decides otherwise, consistent with TSCA or other relevant authority. *See, e.g.*, *WP Co. v. National Highway Traffic Safety Admin.*, No. 24-cv-1353, 2026 WL 820742, at *7 (D.D.C. Mar. 25, 2026) (holding information was submitted under assurances of confidentiality where, in part, the "regulations themselves default to confidential treatment of information that submitters claim to be confidential" until the government makes a determination otherwise); *New York Times Co. v. FDA*, 529 F. Supp. 3d 260,

286–287 (S.D.N.Y. 2021) (records were provided to FDA under an assurance of privacy where, in part, the statute and regulations provided such information was confidential).

Inhance further received specific assurances of privacy during the CBI substantiation process. *See* Inhance Br. 9–10. EPA supplied a general substantiation template for confidentiality claims, which Inhance used to assert its claims. EPA, *What to Include in CBI Substantiations* (captured Jan. 27, 2022), https://tinyurl.com/2wu88wss; *see also Statutory Requirements for Substantiation of Confidential Business Information (CBI) Claims Under the Toxic Substances Control Act (TSCA)*, 84 Fed. Reg. 33939, 33941 (July 16, 2019) (discussing template). EPA also advised submitters like Inhance that TSCA generally bars disclosure of "commercial or financial information." EPA, *Frequent Questions about TSCA CBI* (captured Jan. 27, 2022), https://tinyurl.com/2x8j832k. These administrative representations, particularly when read against the backdrop of TSCA's confidentiality provisions, are more than sufficient to establish express and implied assurances of privacy for submitters. *See, e.g.*, *Flyers Rts. Educ. Fund, Inc.*, 2021 WL 4206594, at *8 (finding agency provided implied and express assurances of privacy through its materials, statements, and longstanding history of maintaining confidential documents). This is not a situation where a regulated party wantonly shared information with a federal agency without any expectation of confidentiality in doing so.

PEER and CEH are also wrong to conclusively claim that much of the disputed information is public, failing to even identify when and where such information was allegedly released. PEER APA/FOIA Br. 6. Inhance maintains strict confidentiality over its information at issue here. *See* Inhance Br. 18; *see also* Kaminer Decl. ¶ 26, Dkt. No. 69-1 (explaining Inhance's information has not been publicly disclosed and is not available from public sources). The information is electronically secure, shared with employees only on a need-to-know basis, and accessible only to

a limited group of employees, technical consultants, and outside legal counsel. Iyer Decl. ¶¶ 13, 14, 28, 32, 36, 38.

Inhance's documents therefore contain confidential commercial information protected under Exemption 4.

### C. Inhance Will Suffer Competitive Harm.

There is no requirement under FOIA Exemption 4 that the owner of proprietary information show that it would be competitively harmed by disclosure. *Argus Leader Media*, 588 U.S. at 430 (finding "this 'competitive harm' requirement inconsistent with the terms of the statute"). However, the additionally relevant TSCA-specific disclosure standard bars release of confidential information where disclosure is "likely to cause substantial harm to the competitive position of the person." 15 U.S.C. § 2613(c)(1)(B)(iii). As Inhance has explained, its information readily satisfies that requirement and is thus exempt from disclosure under FOIA and TSCA. *See* Inhance APA/FOIA Br. 24–25. PEER and CEH repeatedly contend Inhance has no competitors who could benefit from obtaining its confidential information, suggesting that Inhance would therefore be unharmed by its release. PEER APA/FOIA Br. 8, 11–15. They are flat wrong. Inhance will suffer significant competitive harm if its most sensitive data and information are publicized.

To begin, Inhance faces actual—not theoretical—competition in the market. PEER and CEH hammer "the need for Inhance to provide evidence of actual competitors," arguing there must at least be "general evidence" about the competitive landscape "even if no actual competitors are named." PEER APA/FOIA Br. 11. Yet Inhance put forward general evidence on the competition it faces in the market and also named specific, actual competitors who could benefit from the disclosure of its proprietary information. Inhance APA/FOIA Br. 24–25; Iyer Decl. ¶¶ 8–9, 41. Inhance operates in a market with "competitors who are very interested in gaining access to

otherwise confidential information about its research-and-development efforts and customers." Iyer Decl. ¶ 8. Among these competitors are "existing companies selling other barrier protection technologies in the United States that compete with post-mold fluorination." Iyer Decl. ¶ 8.

The Court has already acknowledged that one of these companies, BP Polymers, "is a direct competitor of Inhance in the plastics market." Dkt. No. 37 at 2. In its motion seeking limited intervention, BP Polymers itself explained that its "product directly competes with the fluorination product sold by Plaintiff Inhance Technologies." Dkt. No. 34-1 at 1. Central to BP Polymers' efforts to capture Inhance's market share is its emphasis on the fact that Inhance's fluorination process is "not PFAS free," which BP Polymers juxtaposes against claims that its product has been proven "PFAS-free by the U.S. Environmental Protection Agency." *Id.* The degree to which Inhance has reduced the unintentional generation of PFAS in the composition of the containers that it fluorinates would therefore be extremely useful information in the hands of a competitor whose marketing strategy relies on identifying and exploiting the most recently available data showing differences between Inhance's process and a "PFAS-free" offering. *Contra* PEER APA/FOIA Br. 13 (claiming BP Polymers "cannot derive any competitive benefit from Inhance's efforts to reduce PFAS formation"). Inhance's process and SOP information would divulge these data, conferring a significant competitive advantage on BP Polymers. And it is not hard to envision how Inhance could suffer substantial competitive harm if its customer information is disclosed to a self-avowed competitor of Inhance.

Inhance faces competition from domestic companies offering in-mold fluorination services, "which use fluorination to create a barrier layer during the container manufacturing process." Iyer Decl. ¶ 9(b). Without a hint of irony, PEER and CEH describe Inhance's case for competitive harm as "speculative" while also stating that in-mold fluorination "is believed not to

create PFAS," ignoring that until just a few years ago, nobody—including EPA, Inhance, PEER, and CEH—knew that post-mold fluorination might result in the unintentional generation of PFAS. *See* Inhance Br. 7. In an industry where rapid scientific advances are yielding ever-more-minute measurements of PFAS levels, equivocal findings from a four-year-old study are hardly enough to squelch Inhance's legitimate concerns about the risk it faces in the market. *Contra* PEER APA/FOIA Br. 13 (citing single study released in 2022).

Inhance also has "international post-mold fluorination competitors." Iyer Decl. ¶ 8. Nadinflo is just one representative example of an international competitor providing post-mold fluorination. Iyer Decl. ¶ 9(a). It offers a "wide range" of fluorination services, including "EPA/CARB-certified fuel tanks," one of the key drivers of Inhance's business. Iyer Decl. ¶ 9(a). PEER and CEH make a curious charge in response to Inhance's identification of this competitor, claiming that this "single" company is not "in competition with Inhance, whose business is fluorinating containers, not selling fully fluorinated containers." PEER APA/FOIA Br. 14. The point is not that fluorination services companies like Nadinflo are performing the exact same process as Inhance; it is that these companies inarguably compete with Inhance, and that these competitors could use Inhance's confidential information to refine their own technologies, or marketing, to obtain a competitive advantage over Inhance. *See, e.g.*, Kaminer Decl. ¶ 28 (crediting Inhance's representation that "[r]elease of Inhance's proprietary information would allow competitors in the post-mold fluorination industry, including companies that fluorinate containers internationally and import products into the United States, to improve their own processes without having to invest significant resources to develop and confirm the efficacy of process enhancements").

The record establishes that disclosure of Inhance's information would result in a "windfall" for competitors, who could save "significant time and resources" by piggybacking on the work that Inhance has done "to build and maintain customer relationships and to develop methods, technologies, and improvements for its fluorination process" rather than doing that work themselves. Iyer Decl. ¶ 41. These competitors could then redirect their investments into "developing new products, recruiting talent, offering their products at prices lower than Inhance's, or recruiting new clients—any of which would significantly harm Inhance's competitive advantage." *Id.* That is quintessential competitive harm.

PEER and CEH largely do not rebut the specific ways in which Inhance will face competitive harm if its confidential information at issue in the FOIA case is released. But as both EPA and Inhance have explained, there would be substantial competitive injury to Inhance if the Court orders disclosure of some of its most sensitive business information.

Start with Inhance's process information. Inhance's "[c]ompetitors could use [the process] information to replicate Inhance's fluorinated gas treatment processes as well as customer- and product-specific process variables without having to invest time and resources in developing and improving their own processes." Iyer Decl. ¶ 29; *see also* Kaminer Decl. ¶ 28. A competitor, for example, could use Inhance's Summary of Modifications to Fluorination Process to Minimize PFAS "to replicate Inhance's PFAS-prevention modifications, monitoring protocols, and quality-assurance systems," which would mean a competitor could "implement equivalent safety and reliability measures without conducting its own independent research." Iyer Decl. ¶ 30. Competitors also could use this information to "develop new barrier-protection product lines to compete directly with Inhance in the United States." *Id.* ¶ 31.

Inhance would also suffer substantial competitive harm if its SOP information were released. If disclosed to a competitor, "Inhance's sample handling and contamination prevention procedures" would enable another company "to replicate Inhance's quality assurance capabilities." *Id.* ¶ 33. Also at issue are "Inhance's facility-wide sampling procedures across each of its 10 post-mold fluorination facilities," commercially valuable information that, upon disclosure, would let competitors "develop strategic responses that could erode Inhance's manufacturing strengths." *Id.* Of particular concern is information revealing the proprietary isotope dilution chip testing method that Inhance developed; a competitor could use it to "mimic Inhance's cost-effective method for testing for PFAS." *Id.* ¶ 34. If released, Inhance's SOP information would "reveal[] Inhance's product portfolio, quality control frameworks, and validation strategies." *Id.* ¶ 33; *see also* Kaminer Decl. ¶ 30.

Release of Inhance's customer information would be similarly damaging. A company that gains access to this information would be able to "better understand the market and attempt to poach Inhance's customers." Iyer Decl. ¶ 37; *see also* Kaminer Decl. ¶ 32. The information would also divulge "details about the volume and nature of articles being treated for customers, which would allow competitors to develop targeted pitches." Iyer Decl. ¶ 37. This is some of Inhance's most commercially sensitive information, and in the hands of other companies, it could be deployed to "offer Inhance's existing customers predatory pricing and/or attempt to destabilize Inhance's long-standing relationships with those customers." *Id.* ¶ 37. Just as important as the information itself is the story it tells about Inhance's business: "Full customer and volume data would also reveal Inhance's business dependencies and growth patterns, enabling competitors to exploit renewal cycles and to target Inhance's most profitable market segments." *Id.*

For all of these reasons, Inhance would face substantial competitive injury if its confidential business information is disclosed.

**D. The Disputed Information Is Not A Health And Safety Study.**

None of Inhance's research-and-development records constitute a health and safety study under TSCA. By its plain terms, TSCA defines a health and safety study as "any study of any effect of a chemical substance or mixture on health or the environment or on both." 15 U.S.C. § 2602(8). PEER and CEH argue that this definition must be read broadly to include any data so long as it might bear on health or environmental effects. *See* PEER Compl. ¶ 85, Dkt. No. 1; PEER APA/FOIA Br. 16. This claim was misguided from the start, and it has been further enfeebled by intervening legal developments: The D.C. Circuit recently clarified that "the statutory definition's emphasis on what is being examined or analyzed serves to limit the meaning of 'health and safety study' to the *evaluation of a chemical's effects* and the data on which that evaluation is based." *See EDF*, 124 F.4th at 13 (emphasis added). Without such an evaluation, there is no health and safety study subject to disclosure—and the rest of the definition is not triggered. PEER and CEH's admission that Inhance's research-and-development records do not address any effects on health or the environment is fatal to their argument. PEER APA/FOIA Br. 15–16, 24–25.

PEER and CEH's attempts to distinguish *EDF* are not persuasive. They argue (at 30) that the information they seek—extensive and highly sensitive records from Inhance's research-and-development program—"is totally dissimilar" from the limited categories of information that the D.C. Circuit held were properly excluded from EPA's definition of a health and safety study. But they fail to address *why* the D.C. Circuit upheld EPA's regulatory definition. As the *EDF* court explained, "EPA reasonably determined that certain information is not part of a health and safety study" because that term "refers only to the evaluation of a chemical's health and environmental

effects." *EDF*, 124 F.4th at 11. For this reason, "the name of the submitting company, the name of the testing laboratory, and product information" are properly excluded from a health and safety study, as they "do not pertain to the methods used, the results reported, or the reasoning provided by an evaluation of a chemical's effect." *Id.* at 12.

The same goes for Inhance's confidential information. *See* Iyer Decl. ¶ 38; EPA APA/FOIA Br. at 17, Dkt. Nos. 68, 69 ("No such evaluation occurred here."). Inhance's research-and-development records contain information about its proprietary fluorination process, data measuring PFAS within plastic articles from testing process enhancements to reduce unintentional PFAS formation, standard operating procedures for testing and sampling, and customer information. *See* Iyer Decl. ¶¶ 18, 25–26; EPA APA/FOIA Br. at 16–20. None of this information relates to any "evaluation" of any effect of any PFAS on health or the environment, much less the "methods used," "results reported," or "reasoning provided by" such an evaluation. *EDF*, 124 F.4th at 11; *see also* Inhance APA/FOIA Br. 25–28; EPA APA/FOIA Br. 17–18. They are accordingly "not part of a health and safety study." *EDF*, 124 F.4th at 11.

PEER and CEH insist (at 31) that *EDF* did not undermine EPA's longstanding regulatory definition from a 1982 Health and Safety Data Reporting Rule. They pin their argument on language suggesting that the agency "intended that the term health and safety study be interpreted broadly" to include "[n]ot only . . . information which arises as a result of a formal, disciplined study," but also "other information relating to the effects of a chemical substance or mixture on health or the environment" and "data that bear on" those effects. 40 C.F.R. § 716.3; *see also* 40 C.F.R. § 703.3. But as EPA has explained, EPA APA/FOIA Br. 16–18, the agency's regulatory definition does not expand the definition of a health and safety study beyond TSCA's plain language: Only a "*study* of any *effect* of a chemical substance or mixture *on health or the*

*environment*" counts. 15 U.S.C. § 2602(8) (emphases added). Although certain information "may be relevant to a chemical's effects generally," information's mere relevance does not make it part of "a particular study's evaluation of a chemical's effects on health or the environment," nor "information underlying that evaluation." *EDF*, 124 F.4th at 14. Inhance's research-and-development information does not bear on or relate to "a particular evaluation of a chemical's effects," *id.*, which means it does not constitute a health and safety study under TSCA.

PEER and CEH's reliance on EPA's 1982 regulation is even further afield for additional reasons. Inhance's confidential information was not submitted under that rule and is not governed by it. *See* 40 C.F.R. § 716.20(a)(9) (exempting "[s]tudies on a substance . . . manufactured . . . only as an impurity" from reporting requirements); *id.* § 716.50(a)–(b) (requiring reporting of "[s]tudies of physical and chemical properties" only if "performed for the purpose of determining the environmental or biological fate of a substance, and only if they investigated one or more" of properties such as "water solubility" and "adsorption/desorption on particulate surfaces, e.g., soil"). To the extent that the regulatory definition—and the legislative history it relies on—goes beyond TSCA's plain language, it is contrary to the statute. *See EDF*, 124 F.4th at 11 (defining health and safety study and explaining that courts must exercise "independent judgment" to "reach 'the best reading of the statute' " when "determining whether an agency's interpretation of its governing statute is contrary to law") (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 393, 400 (2024)). And even if the 1982 definition were "controlling," as PEER and CEH claim (at 15), Inhance's confidential information would not meet it: Nowhere in Inhance's research-and-development records were "measurement[s] of a chemical's concentration in the workplace or environment" aggregated and "analyzed to draw conclusions about *occupational or environmental*

*exposure*." *Health and Safety Data Reporting; Submission of Lists and Copies of Health and Safety Studies*, 47 Fed. Reg. 38780, 38782 (Sep. 2, 1982) (emphasis added).

PEER and CEH spill a lot of ink (at 17–21) claiming that Inhance's research-and-development program was not intended to improve its fluorination process, but rather to inform separate risk assessments conducted by Inhance and EPA to understand "how PFAS . . . is spread throughout the economy and environment." This is both factually incorrect and legally irrelevant. *See* Inhance Br. 19–20; Inhance APA/FOIA Br. 22, 25–27. The Inhance research-and-development program at issue here was designed solely to test and implement improvements to its fluorination process to reduce production of unintended impurities that might deter customers from purchasing Inhance's products. Iyer Decl. ¶¶ 11–12, 26, 38. Factors such as PFAS environmental migration and exposure were not measured nor assessed and played no role in Inhance's process enhancement research-and-development. *See id.* And even if Inhance's program were relevant to later exposure assessments, the disputed information would still not be a health and safety study because it in no way "evaluates . . . a chemical's health and environmental effects." *EDF*, 124 F.4th at 11. Indeed, PEER and CEH themselves appear to appreciate the distinction: They stress that the information should be disclosed because "testing to determine the precise amounts of PFAS that container users may breathe, ingest, or absorb" would be "difficult, time-consuming and complex to perform." PEER APA/FOIA Br. 20. But Inhance's data about the physical-chemical composition of containers themselves does not measure exposure at all and thus cannot be contorted into exposure data. And the purported next-best thing to a health and safety study is not the same thing as a health and safety study. TSCA's definition is precise. *See* 15 U.S.C. §§ 2602(8), 2613(b)(2).

Unable to pinpoint any evaluation of health or environmental effects in Inhance's research-and-development data, PEER and CEH instead fall back on EPA's November 2023 risk

assessment. PEER APA/FOIA Br. 21–24. Their argument, so it goes, is that EPA's later risk assessment retroactively transformed Inhance's confidential information into a health and safety study because EPA broadly considered "test data demonstrating the presence of PFAS in fluorinated products" in drawing its conclusions. *Id.* at 23. To describe this claim is to refute it.

First, the plain language of TSCA's disclosure exception for health and safety studies does not permit PEER and CEH's interpretation. TSCA's health and safety exception authorizes disclosure of two precise types of information: (1) "any health and safety study which is submitted under this chapter with respect to" a "chemical substance or mixture" offered for commercial distribution or for which testing or notification is required; or (2) "any information reported to, or otherwise obtained by, the administrator *from a health and safety study*." 15 U.S.C. §§ 2613(b)(2)(A)–(B) (emphasis added). In other words, the information must constitute a health and safety study in its own right, or it must be derived from a health and safety study, to be disclosed under the exception.

But here, neither EPA's risk assessment nor Inhance's confidential research-and-development records were submitted under TSCA as a health and safety study. *See id.* § 2613(b)(2)(A); *see also* EPA APA/FOIA Br. 6; Iyer Decl. ¶¶ 15–19, 38. Nor was Inhance's confidential information taken "from a health and safety study" and then "reported to, or otherwise obtained" by EPA. 15 U.S.C. § 2613(b)(2)(B); *see also* EPA APA/FOIA Br. 6, 17–19; Iyer Decl. ¶ 18, 38. PEER and CEH thus cannot rely on EPA's later risk assessment to render Inhance's confidential information, separately prepared for a commercial purpose, a health and safety study.

Even if EPA could somehow undo protection for a business's confidential information through subsequent regulatory action—a power unsupported by TSCA and which EPA has not asserted—Inhance's research-and-development data is not information "underlying" EPA's risk

assessment. 15 U.S.C. § 2602(8). *Contra* PEER APA/FOIA Br. 23. That term "is an adjective 'used to describe something on which something else is based.' " *Confidential Business Information Claims Under the Toxic Substances Control Act (TSCA)*, 87 Fed. Reg. 29078, 29089 (May 12, 2022) (proposed rule) (quoting *Underlying*, Cambridge Dictionary Online, https://tinyurl.com/2z473msb (last accessed June 18, 2026)); *see also EDF*, 124 F.4th at 11 ("EPA's construction of the term [health and safety study] reflects the best reading of the statute."). Under TSCA and its implementing regulations, however, the definition of a health and safety study excludes information "that does not form the basis" of an evaluation of a chemical's effects. *EDF*, 124 F.4th at 11 (defining "underlying information" as "the data on which a study is based").

PEER and CEH have not shown that Inhance's research-and-development data "formed the basis" of EPA's risk assessment. For starters, EPA's qualitative risk assessment did not purport to be based on Inhance's research-and-development records or cite Inhance's product-development data. *See* Dkt. No. 52-2, at 62–64. Nor do any of EPA's conclusions in the assessment rest on Inhance's research-and-development data, which measured only concentrations of PFAS in the composition of the plastic articles themselves to test and refine improvements to Inhance's fluorination process. *See* Iyer Decl. ¶ 38. By contrast, EPA's risk assessment disregarded "uncertainty in the amount" of PFAS "manufactured as byproducts during the fluorination process"; its assessment instead relied on the mere fact "that they are formed and do exist." Dkt. No. 52-2, at 83. Thus, Inhance's data measuring particular concentrations of PFAS under various process enhancements is not "relevant to the study results," 87 Fed. Reg. at 29089, even if the risk assessment could be considered a health and safety study.

In any event, EPA's risk assessment is void. The assessment was based on Significant New Use Notices that Inhance submitted to EPA pursuant to the agency's TSCA Section 5 investigation.

*See* Dkt. No. 52-2 at 58. EPA relied on this risk assessment in issuing its TSCA Section 5 orders, which the Fifth Circuit vacated because EPA lacked the authority to regulate Inhance's fluorination process as a "new" use. *See Inhance Techs. LLC v. EPA*, 96 F.4th 888, 894–896 (5th Cir. 2024); *see also* EPA, *Risk Assessment of the Per- and Polyfluoroalkyl Substances (PFAS) in SN-23-0002-0006 and SN-23-0008-0011* (Jan. 6, 2026), https://tinyurl.com/ycsb8pax (recognizing the orders were vacated). The Fifth Circuit's reasoning applies equally to the risk assessment, which was prepared based on EPA's now-rejected theory that Inhance's process was a "new" use.

Inhance's own risk assessments likewise were not based on Inhance's separate research-and-development program, which measured the effectiveness of modifying various process parameters in *reducing* unintentional PFAS formation. The research-and-development data was accordingly not relevant to the conservative estimates on which Inhance's risk assessments were based.

PEER and CEH's argument that Inhance's research-and-development records should be disclosed in their entirety, without regard to the different types of information contained in them, fails for similar reasons. PEER and CEH contend that there is no need to consider whether each category of withheld information comes from an evaluation of a chemical's effects, and they urge this Court to instead treat all of Inhance's documents together as "a comprehensive body of data." PEER APA/FOIA Br. 24–29. PEER and CEH's preferred holistic approach is once again foreclosed by TSCA, its implementing regulations, and D.C. Circuit precedent.

Far from being "misleading to focus on particular data elements in isolation," PEER APA/FOIA Br. 26, TSCA directs EPA to do just that. For instance, even when contained in a health and safety study, TSCA prohibits "disclosure of any information . . . that discloses processes used in the manufacturing or processing of a chemical substance or mixture." 15 U.S.C. § 2613(b)(2).

And TSCA likewise acknowledges that "[i]nformation that is protected from disclosure under this section" may be "mixed with information that is not protected from disclosure." *Id.* § 2613(b)(1). When that happens, the confidential information "does not lose its protection from disclosure notwithstanding that it is mixed with information that is not protected from disclosure." *Id.* EPA's interpretation points the same way. *See* 87 Fed. Reg. at 29089 (distinguishing a "study document," which may contain "information beyond that which is the basis for the study," from a specific health and safety study). TSCA therefore requires EPA and this Court to consider whether each *category* of withheld information pertains to an evaluation of a chemical's effects. *See* EPA APA/FOIA Br. 20. As Inhance has explained, *supra* pp.15–18, none of them do.

In response, PEER and CEH argue that Inhance's process information, standard operating procedures, and customer information "collectively contribute to an understanding of differences in PFAS levels for different container types," which in turn "inform[s] the overall impact of Inhance's process changes on PFAS formation and exposure." PEER APA/FOIA Br. 27. They contend that the specific process parameters Inhance tested, its customer information, and its sampling procedures "are crucial to understanding the overall effectiveness" of Inhance's research-and-development program and "critical to verifying" Inhance's results. *Id.* at 27–29.

The D.C. Circuit has already considered and rejected this argument in the *EDF* case decided after PEER and CEH filed this suit. *See EDF*, 124 F.4th at 14. In *EDF*, the plaintiff similarly argued that failing to disclose the entire study document would "make it more difficult for the public to understand a chemical's uses and exposures, as well as the strength and reliability of the studies." *Id.* But the court explained that the "mere fact that a member of the public may find certain information" to be a "useful" interpretive aid "does not cause that information to become part of an evaluation of a chemical's effects." *Id.* The D.C. Circuit took care not to expand

the intentionally limited definition that Congress enacted: Although "the excluded information may be relevant to a chemical's effects generally" or "provide clues about a chemical's potential real-world effects," information does not form part of a health and safety study unless it pertains to a "specific study's evaluation of the chemical's effects" on health or the environment. *Id.*

For all the reasons Inhance has explained, none of the information in Inhance's research-and-development records evaluates any health or environmental effect, so Inhance's records cannot be disclosed under the health-and-safety study exception. *See* 15 U.S.C. §§ 2602(8), 2613(b)(2).

### E. The Non-Disclosed Information Is Not Generalized.

Inhance's confidential records do not fall within TSCA's narrow exception for "general information describing manufacturing volumes" or "a general description" of a manufacturing process that "customarily would be shared with the general public." 15 U.S.C. § 2613(b)(3). As Inhance and EPA explained, nothing about the information describing Inhance's process under *specific* parameters and relating to *particular* articles treated for *particular* customers is "general." Inhance APA/FOIA Br. 28–29; *see also* EPA APA/FOIA Br. 20–24.

In response, PEER and CEH say nothing at all. The exception goes unmentioned in their opposition, which amounts to abandonment of the narrow-exception argument raised in their motion, PEER Br. 42–44, Dkt. No. 52-1. *See Sykes v. Dudas*, 573 F. Supp. 2d 191, 202 (D.D.C. 2008) ("[W]hen a party responds to some but not all arguments raised on a Motion for Summary Judgment, a court may fairly view the unacknowledged arguments as conceded."). The Court may decide this issue in EPA's and Inhance's favor on the ground that Inhance's information does not fall within this narrow exception. *See Pinson v. DOJ*, 70 F. Supp. 3d 199, 205 (D.D.C. 2014) (granting DOJ summary judgment where FOIA requester did not address DOJ's failure-to-exhaust argument and therefore conceded that argument).

## II. THERE IS NO BASIS FOR ADDRESSING DOCUMENTS NOT INCLUDED IN EPA'S FINAL CONFIDENTIALITY DETERMINATION.

Finally, PEER and CEH concede (at 21 n.3) that they are no longer asking this Court to address disclosure of additional confidential information Inhance provided to EPA that has not yet received any process under FOIA and TSCA, but they contend that this Court may nevertheless consider this information in "understanding" this case because it is "integrally related" to the disputed documents. As Inhance has explained, there is no basis for that: This Court has already limited this case to "the propriety of EPA's withholding of documents responsive to PEER and CEH's first FOIA request that have resulted in a CBI determination." Minute Order (Mar. 13, 2026); *see also* Inhance APA/FOIA Br. 29–30.

Contrary to PEER and CEH's contention (at 6 n.1), Inhance also has not abandoned its opposition to PEER and CEH's motion for judicial notice. Inhance opposed the still-pending motion, and its arguments opposing judicial notice have special application in the APA/reverse-FOIA action, where the "focal point for judicial review" is "the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam); *see also* Inhance Opp. Br. 2–7, Dkt. No. 54. And PEER and CEH's suggestions that Inhance's information at issue in the reverse-FOIA action may be released under FOIA Exemption 4 or TSCA's health-and-safety-study exception are post-hoc rationalizations and fail on the merits for reasons Inhance has explained. Inhance Br. 19; Inhance APA/FOIA Br. 20–21, 25–28.

## CONCLUSION

For these reasons and those explained in Inhance's brief in support of its cross-motion for summary judgment in the FOIA case, this Court should enter summary judgment in favor of Inhance and against PEER and CEH.

Dated: June 18, 2026

Respectfully submitted,

*/s/ Susan M. Cook*

Susan M. Cook (D.C. Bar No. 462978)
Adam M. Kushner (D.C. Bar No. 426344)
Marlan Golden (D.C. Bar No. 1673073)
Claire A. Rhodes (D.C. Bar No. 90016150)
Carly M. Heying (D.C. Bar No. 90029062)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
susan.cook@hoganlovells.com

J. Tom Boer (D.C. Bar. No. 469585)
HOGAN LOVELLS US LLP
4 Embarcadero Center, Suite 3500
San Francisco, CA 94111
Telephone: (415) 374-2336
Facsimile: (415) 374-2499
tom.boer@hoganlovells.com

*Attorneys for Inhance Technologies LLC*